We'll call the next matter Morris v. Attorney General. Mr. Bruno? Yes. May it please the court, my name is Thomas Bruno. I represent Christopher Morris. This is the case that revisits the sordid history of racial profiling in the state of New Jersey, which created a big black spot on New Jersey's law enforcement agency from the Office of the Attorney General through the Commander of the State Police Office down to the troopers in the Morristown Barracks. I represent Christopher Morris, who was a young African male who was traveling with another African male in the mid-20s, traveling down the New Jersey Turnpike in a late model vehicle, and this stop was a textbook racial profile stop. May I interrupt there for just one second, because I do recall that period in the state's history involving racial profiling. And going into this case, I was struck by a number of facts that seemed somewhat anomalous, which is that the two state troopers that were involved in the stop in this case, as I understand, are African Americans. That doesn't – you don't disagree with that fact? No, I do not. I understand that African American state troopers themselves were kind of encouraged to racially profile, but let me go on for just a moment. The vehicle that they stopped had shaded windows, and it wasn't slowly going by. It was apparently speeding when they stopped it. I wonder whether racial profiling is really an element of the case or whether it's really inconsequential. Particularly because this is a malicious prosecution case at this point. That's correct. And then the standard for malicious prosecution in this particular case, I can point to the record for the court. The interim report, which is part of the record, specifically addresses that minority troopers were found to be just as complicit in racial profiling. Let's go back to what we're really complaining about. For the malicious prosecution, your case really rests not on the profiling, but the claim of planting of drugs. Right? Correct. That's what the malicious prosecution claim rests on, the planting of drugs. That's correct. And you never got there because the district court said you failed to meet the first element, which was a favorable disposition. The second element, yes. One of the elements, yes. Okay. So that's really what your legal claim is about on malicious prosecution. And I guess secondarily, if there's no evidence of the planting, then you're out. And your argument is there is evidence of the planting. We have the depositions. And the district judge refused to consider that first because she threw it out for another ground, but also because she rested on your failing to make a counterstatement of fact. Right? In part, yes. But we did in our ‑‑ and we think that's a misapplication of Rule 56, based upon our argument contained within the brief and the record that was presented to her, including the deposition testimony of Mr. Morris as well as the individual, Mr. London. So you think you have enough to have evidence from the mouth of the plaintiff and his passenger that the drugs were planted, but you have to get past that other thing, the other problem with the favorable disposition, right? Right. Except that the law is in our favor in the sense that it was dismissed, and administrative dismissal prior to any fact finding of innocence or guilt has always been considered a favorable termination. Can I ask you, stop you there, this word, this term, administrative dismissal, I don't know what that means exactly. I mean, it seems that the government moved and it was dismissed. Don't we, shouldn't we just get beyond this label of administrative dismissal and look to the facts of what the dismissal was all about? I don't, is that defined anywhere, administrative dismissal? I think it was an administrative order by Judge Bronsik, by the judge, in 76 cases. They asked that these cases be dismissed. What's the significance of administrative versus just an order granting government's motion? I mean, it seems that you're seizing upon this label of administrative dismissal to say, look, administrative dismissal must be. If you put instead of administrative dismissal on it just order, would this case be different? I don't know that it necessarily would be any different. If they decide not to proceed, if the prosecutor decides to just abandon the proceedings for whatever reason, before any determination as to any fact finding on guilt or innocence, that would be a dismissal, and it would also comport with restatement toward section 659, which presents a standard, 659C. It says the formal abandonment of the proceedings by the public prosecutor. So it certainly would squarely fit within that. And here the judge improperly puts the burden on us to prove innocence when innocence isn't, you know, how can we prove innocence? We didn't have an opportunity to present any defense or, in this case, to show that we did nothing wrong. But from day one, Mr. Is it standard to show innocence or that the evidence be indicative of innocence? I mean, innocence is a very legal term. It's a term of art. It's what the jury may decide. They say not guilty. Well, some fact finder has to make a determination. But here there was no determination by any fact finder. I mean, in part Well, that happens when, for example, in a motion to suppress, and the evidence is suppressed, and the government or the prosecutor says, look, I have evidence here, but it's been suppressed, and without it the drugs have been suppressed. I really can't prove my case. That doesn't mean that the defendant is innocent. It means that I can't prove my case, and, you know, administratively, rather than waste the court's resources, I'm going to dismiss the case. With that in your terminology, that would be a favorable termination. No, Judge, because that's also covered by the Restatement 2nd, which covers motions to suppress, because that's one of the exceptions under Restatement 2nd, Section 660, which talks about a motion to suppress. But even there, if I may, just in a motion to suppress, there was a finding where it's dismissed. There's some finding there that was reached by a fact finder. So that's covered by 660, right, in the restatement. Here, Mr. Morris didn't get a chance to testify. He had no chance to have his credibility weighed. Mr. London had no chance to testify and have his credibility weighed. And so, especially in this context where it was known through, you know, the disparate and separate treatment of minorities on the New Jersey Turnpike, it wasn't so much the stop, but how these minorities are treated in the stop. And the statistics, as in the report, indicate that 80 percent of the blacks and Hispanics who were stopped gave a, quote, consensual search, 80 percent. You know, this sounds like it relates more to your selective prosecution claim, because if there was a nonconsensual search and those were conducted more often for minorities than not, and therefore they found drugs, in that case, then I suppose you can make some kind of selective prosecution claim. That's correct. But I can also state to the court, with regard to this particular issue. I mean, it's like two different things. One, you're saying the drugs weren't there. The other one, you're saying, well, they found drugs and they selectively prosecuted. Well, searching, when you search and then you, quote, find these drugs, I can, you know, I think the court's well aware this week in Camden Federal Court, two Camden City police officers are on trial for planting drugs on innocent individuals in the city of Camden, where there were four police officers indicted, two pled guilty, two are on trial this week for similar conduct, which is alleged in this particular case. So it does happen, and they are minority officers, you know, who are on trial for planting to minority individuals. You didn't raise the planting evidence issue when you made your first motion to suppress back in the late 1990s, if I'm not mistaken. Is that correct? In other words, you moved to suppress the evidence. In other words, you're essentially conceding there is evidence, but I want it suppressed. And that was the thrust of your initial motion to suppress. Is that accurate? I believe, well, I didn't represent him in that, but I don't believe. Well, and then there was a motion for reconsideration of the denial of the motion to suppress it, and it was to suppress the evidence. It wasn't to move to suppress the evidence because the evidence had been planted. It was to suppress the evidence. So planting the evidence didn't come up until, if I'm not mistaken, six years later, when you filed the case in the district court? I think, no, Judge. I believe that the. . . I'm happy to get your correction on the record. Well, I don't know in terms of how you, you know, present a motion to suppress. I don't know necessarily that planting drugs would be part of a motion to suppress or part of the defense in the case in chief. Well, that's okay. Well, I'll take a motion to dismiss because the evidence was planted. Anyway you want to present it to a court, you've got to present it somehow. Correct, but you would do it sequentially. You might say the first. . . And this would have to go to the way that the criminal defense attorney chose to handle the case. Let's go for this first because we're going to go with the racial profile. First we're going to go with. . . It couldn't have happened that way because of the way that the officer more changed his testimony, that on his investigation report is different from what he comes into court and testifies. For example, that there were. . . The reason why I asked for a search and asked him to step out of the car is because there were dangling wires. There was a glove box that was open. There was something else that was in disarray in the car where, in fact, counsel presented testimony. In fact, the Jetta, the 1996 Jetta, doesn't have a glove box and that the co-officer didn't see any of these dangling wires. They didn't see any disarray inside the car itself. And that there were two particular prosecuting attorneys on the motion to suppress. One had said, oh, we're going to present testimony that we found this ball of cocaine based upon a pat-down where the officer thought it was cocaine or drugs. Then about a month later she presented another memorandum where she said, no. I talked to the officers and now they say that when they did a pat-down, they felt that it was a weapon or a gun. And yet now when Officer Moore testifies, he says no. He goes back to the original version that now it was just no, I felt that it was possibly drugs. So you have all these inconsistencies that I believe that counsel at that time in her motion to suppress thought that she might be successful just on that basis alone without getting to, you know, Mr. Morris testifying with regard to. I guess maybe as you say or suggest it was a strategic decision on the part of counsel. But I'm still wondering because it took six years, about six years for this issue of planting of drugs to come up, which seems to be very odd. It took more than three years to get to the point where he had the first trial. And you may recall from the record that in the first trial there was a mistrial because the jurors were so thought it was so humorous, the testimony of Officer Moore, that they were laughing about his testimony and say, can you believe that what that officer said in the courtroom? And and that was that's on the record. And I think that the if I just could give the citations record 242467 is where the jurors were laughing about the testimony of Officer Moore. Maybe that's why there was a second trial. Well, that's there was a mistrial after that. But before the second trial is when all this occurred. So get you back to one. One other thing before I yield. You said that there was no determination that there was any culpability here or that it was simply a prosecutorial decision to abandon all efforts to try these cases. But I thought that the attorney general had made a statement. And whether you disagree with it or not, had stated that in all of these cases, there was evidence of criminal conduct. I don't know that it's that specific. He does say that there is criminal conduct in this and that some of the individuals shouldn't be pitied. But I can say to this court that we attempted as part of our case in chief to get the attorney general who actually made the recommendation because there was a memorandum. That was an internal memorandum in the attorney general's office of the state of New Jersey. We tried to get we subpoenaed the attorney general and also to the records. And that was quashed. We were unable to obtain that secret memo or that internal memo. And that would have been the critical piece of evidence, not a political statement by the attorney general, who at this point, that was an attorney general former who's trying to say, well, we're going to do the quote, for these other 76 individuals when, in fact, it was just more like a whitewashing because they didn't want to have everything exposed as to what exactly was occurring there. Well, we're not exactly determining whether it was proper to quash the subpoena or not. But what Judge Fuentes mentions, I mean, that doesn't exactly indicate innocence, does it? Well, he's not the attorney general can't make any determination as to innocence or guilt. There was no jury or fact finder. He had never spoken to Mr. London. He had never spoken to Mr. Morris. But he can say what motivated him to unmask, dismiss all these cases. He gave a press statement that I think that would be a political statement. It wasn't under oath. And, you know, and he didn't particularly say in the Morris case. He said it was just a broad brush out of these, quote, 76 cases. We don't know what the criteria was for these 76 cases. You know, he may have said, well, look, I'm just going to throw in some of the bad cases and some of the good cases and put them all in there and just move on. He knew there was a trial here because they knew it from day one when the prosecutor, as I said, had the two versions at the motion to suppress. And then with the mistrial and the jury with the, you know, non-credibility of Officer Moore was the one who says that he found and discovered the drugs. So all those factors, who knows what Attorney General Farmer knew. And he did know that he had to have known that there was a mistrial the first time because of the conduct or because of, you know, the officer. So that case was going down the tubes. Okay, Mr. Bruno. Thank you. Thank you. And we'll get you back to me. Ms. Wood. Afternoon, Your Honors. May it please the Court. The district court judge was absolutely correct to grant summary judgment in favor of the defendants in this case. The law on malicious prosecution is clear that there must be a favorable termination and something that's indicative of innocence. The trial judge did. This is where I'm confused. We have these cases where a person's been convicted once, okay, so there's no innocence there, even though they may have an appeal. But this is a case where a case is thrown out, it's dismissed. And if there's a blanket rule that every time that the district attorney decides, okay, I want to dismiss the case, the person can never have an opportunity to show that they're innocent. I think, Judge, that there are a lot of cases out there that show the situations where you can prove that. This just is not one of them. And I think if you look, I think Judge ---- We have to look at the facts that he's alleging. He's alleging now. I'm not saying whether I believe this or not. I'm just saying he's alleging that the drugs are planted. That's what he's alleging for the purposes of the malicious prosecution claim. And he has testimony. Now, I suppose it's testimony that would be subject to some impeachment testimony, but he has testimony that the drugs are planted. And so he says, okay, you dismissed it, but I was totally railroaded, and I never had an opportunity to show that. So if we have a blanket rule that one of these dismissals that tells you nothing about innocence or not innocence can never be a malicious prosecution case, there's a problem. But I don't think that we have that here, Judge, because there is an extensive testimony in the criminal proceeding about what happened. The judge in the state criminal proceeding considered the matter considered racial profiling and rejected it outright three times. It wasn't just once, and it wasn't just one motion for reconsideration. It was three times. And three times there was no mention of this planting of evidence. Three times the trial judge said, I don't care about racial profiling. There is racial profiling. We all know it now. It's going on. The state has admitted to it. But that's not what happened here. In this case, there was no racial profiling. In this case, the stop was not the same type of stop where those things happened. I don't even think we're talking about the stop in this case. I think we're talking about the stop. But it all stems from the stop. It has to stem from the stop. You can't say, well, the troopers, it was all the troopers' fault, and they racially profiled and removed that from the prosecution of it. The prosecution began because the troopers stopped them. And in this case, the troopers stopped them correctly. Suppose we have a case where the only thing we have is a raw dismissal. What's the rule? Well, I think it would totally depend. As Judge Segarra suggested earlier, you look at the entirety of the facts in the proceedings where the dismissal happened. And that's what we are asking this court to do here, is look at the entirety of the facts. And the entirety of the facts include the fact that Judge Koenig, the state court judge, said there is no racial profiling here. The stop was right. The drugs were found. The drugs are here. We look at the fact that it even got to a trial when there was no mention of planting of drugs. It was in the middle of a trial, and they never made that motion. So it only comes up for the first time when there's a new attorney, not the criminal attorney, not the one that was representing Mr. Morris in the criminal proceeding, but a brand-new civil attorney, and all of a sudden we have this allegation six years after the fact that there was this planting of evidence or planting of drugs. None of that happened. None of that was considered by the criminal judge. And I think what's also important to look at is what Attorney General Farmer said at the time. He gave a number of reasons for why he was looking to dismiss this group of cases, the post-indictment pretrial cases. He said we should have probably looked and seen this sooner and investigated the actions of the state police a little bit sooner. But we are looking to move forward. But make sure, be aware that these people are criminals. Some of them would have had the evidence suppressed. That wasn't this case. He tried three times to have the evidence suppressed in this case, three times, based on issues of racial profiling, and it was rejected three separate times. We would have to, in a sense, get into credibility issues, wouldn't we, if we have to say, look, you should have brought this claim up before. We don't believe it. Therefore, you lose. But the point of fact, it is a question of fact, isn't it? What do we do with that? But it's not. I know it sounds incredulous to you. But it's still a question. Yes, Judge. But I think that in looking at the criminal prosecution ends in his favor in a way that is indicative of his innocence. That is the question that we are looking at here. It's ending in his favor in a way that is indicative of his innocence, not his actual innocence, because the judge was very clear in her decision that she was not saying that he had to prove actual innocence, but that it was indicative of his innocence. But in this case, Ms. Wood, the district judge would not consider the planting of the drug issue. In fact, she said it's too late. But it really wasn't too late, was it? Well, it was too late, Your Honor. There's no concrete proof in the criminal proceeding that there was this planting of drugs. Again, you're getting into an issue of fact. And the district judge, as best I can tell, made no ruling on the assertion that the drugs were planted. But I still don't think that you need to get to it, Your Honor, because I still think it's clear. The district court judge was correct that the proceeding was not indicative of the dismissal. You see what the problem is? Okay, you have this case, and we never really got to this whole issue of the drugs being planted. The district court looks at it, and it says, this is how the district attorney or the attorney general explained it. In another case, it might look pretty weird to say it's not a favorable outcome when just out of the blue, the district attorney dismisses the case. You know, I would feel kind of nervous about saying a person can't bring a malicious prosecution case when they haven't had any opportunity to do anything. But there is a body of law that says when you can do that, and there are circumstances when it's clear, when the attorney general or the county prosecutor in this case, because it wasn't the attorney general, the county prosecutor declines to indict indicative of innocence when there is an acquittal indicative of innocence. Here, the county prosecutor, who was separate from the state police and the troopers, did indict. A grand jury did find that there was reason to hold this person over, and the indictment happened. So you have these things that are not indicative of innocence, and then you have the attorney general saying why he decided to just save resources, which there is a state case, the Freeman case, that says when you dismiss a case, when you are removing it because you're looking to save resources, that's not indicative of innocence. I want to get to selective prosecution, but I don't want to interrupt this train. One really broad question. The policy that underlies the favorable termination rule is to prevent somebody from prevailing in a civil case in a manner that would be inconsistent with a criminal conviction. But that policy doesn't seem to be implicated here, does it? To prevent or avoid inconsistent results. Well, yeah, because there was no result here. That's right. If the policy is not effective, why wouldn't they just let this case go forward? Well, because there still needs to be something that would indicate that it was malicious. And I think as well, Your Honor, then you could move into the third element, which is the no probable cause. And once you have the indictment, I think that the probable cause was established. And so even if you are questioning the favorable termination, you next consider, he loses again on probable cause because the grand jury indicted. To prove maliciousness, does that bring racial profiling back into the case? Well, I think that there was a finding, you know, that in this case there was no racial profiling by the state court judge. The racial profiling didn't happen. Well, there was no racial profiling in the stop. In the stop, by these two troopers. What about the search, the manner of searching? Well, I think that the trooper gave an explanation that was accepted by the lower courts. He was moving around and the officer was concerned for his safety. But why would a decision by a state court judge on preponderance of evidence with respect to suppression, you know, get rid of somebody's right to a trial by jury on the issue? Well, because you go back again to, you know, was it indicative of innocence? You have to get to the – you're back to – you always have to come back to that. You're back at that element again. Yes. Which of these defendants was actually responsible for the decision to prosecute? None of these defendants were responsible for the decision to prosecute, and that's one of the arguments that we made in our briefs, that the county prosecutes. The county prosecutor, Middlesex County prosecutor is the prosecutor. They're going on a proximate cause idea, at least that the troopers caused this basically. By the stop. Well, by the stop, by the search, and either the planting or the nonconsensual search. And if you want to look at the selective prosecution element, that what the troopers did then caused the person who prosecuted to do something based on their information, that it was the proximate cause of the prosecution, and it was either malicious prosecution or selective prosecution because the troopers did it because they were black. That's the theory. Is there something wrong with the proximate cause theory for 1983 liability? Well, I think that we have, again, here, we have the intervening grand jury who were separate and apart, and that then, you know, puts the stuff. If the drugs are planted, or if they were planted, but there's selective prosecution through discriminatory intent by the troopers and everything the grand jury has as a result of that, you think that cuts off liability? Well, yes. I think that because there is an intervening, I think the law is clear on that as well, that there's something intervening. But it's not intervening if it's caused by this conduct. If everything given to the grand jury is fake, or everything given to the grand jury is because of an unconstitutional reason, then what the grand jury does is not intervening so as to cut off liability, is it? But they still have to make an independent decision, and there's still other levels of review. I mean, it has to be the prosecutor has to decide whether or not to... Everything the prosecutor knows is because of the decision of the troopers. If everything the prosecutor does is because of tainted behavior by the troopers, then there's no intervening cutting off liability. But in this case, we don't have that, Judge, and the trial... Well, we never got there, did we? That the stop was correct in this case, and that the drugs... A criminal court's decision on suppression matters decide the federal civil case where they might be entitled to a jury if they have enough factual evidence. But it's evidence, Judge. Who said we're reweighing evidence? Who says we reweigh evidence? I mean, it's evidence of the elements being satisfied. Now, we're not reweighing the evidence before the criminal judge, but it removes the element that is needed. If there is evidence going in two directions, and it's sufficient, it gets to a jury, even if what the criminal judge did is some evidence in the other direction, right? But there really was no evidence here, Judge. I mean, we had his testimony, but it was so outweighed, I think, by all of these other things. You didn't bring it. Six years later, you had three motions to suppress. You never raised the idea that drugs are planted. You actually were starting and proceeding in the middle of a trial, and you never once raised the idea that there is the possibility of drugs being planted. Not once. Not once in all of that time. Is that ever raised? Evidence is incredible. Doesn't the final trier of fact get to decide that? That's the question. You know, the question is, is there some reason that the district judge did not have to send this to the trier of fact? I think because the criminal – all finding that the colorable issues of racial profiling did not result in favorable terminations. I think that that was – there's 15 or so cases, all of which make that finding. You know, I think the district judge realized that everything else is an issue of fact, and it's only if there's a legal barrier through that issue that she works on the malicious prosecution that you don't have to go to the jury. And I think it's obvious she thought there was a legal reason not. She never said – she never made factual decisions on these other issues. No, she didn't. She knows she's not the trier of fact. No, she didn't make those. But she found, as did every other court that considered these very same cases, that what happened here, that colorable issues of racial profiling and the attorney general's decision to dismiss an entire group of cases was not a favorable termination. The attorney general's statement demonstrates that it was not a favorable termination. I have to get back to you, Mr. Bruno. Would you finish up, please, Ms. Wood? Well, the only other thing that I would say is that on the selective prosecution case, which I don't think we ever really got to. Well, I was getting to it. Well, yes, that the trial judge was correct to dismiss that as well. I think what's important here is, you know, in talking about the troopers themselves, and I think, Judge Fuentes, you raised this, that they were African-American themselves. They testified, you know, against racial profiling before the Senate, when all the hearings were going on. Their statistics, there was an argument in Appellant's brief about the statistics of racial profiling, and I think what he is trying to do is say, well, the statistics generally, without consideration of, you know, what actually happened in his own case, the statistics generally mean that I prevail and that the judge was wrong, but the statistics here demonstrate that these two troopers did not engage in racial profiling. Their stops of minorities were much, much lower than their stops of whites and other people. It's also not the stop in this case we're talking about. Now, he stopped these guys because they were minorities. They couldn't see them. The question is, did they do nonconsensual searches after they stopped them because they were minorities? But the statistics on their searches demonstrate that these two troopers, who were the only troopers that were involved, didn't do that type of thing. They did not have those kinds of issues that maybe other troopers had, which is also what the attorney general said in dismissing me, is that there were some individual troopers who may have had problems, but it was not, you know, but it was only a small group of trooper, individual troopers. Nothing in the record here demonstrates that these troopers. He said he couldn't determine racial profiling cases from those that were not racial profiling. I'm sorry. He said he couldn't separate racial profiling cases from those that were not racial profiling. Well, I think we didn't do that because there was an administrative cost to that. It would have been very burdensome. There were 76 of these post-indictment pretrial cases. There were over 100 where the convictions were then overturned or dismissed. So what the attorney general did was make a financial decision about whether or not he was going to use very limited state resources to defend and to face all of these challenges. And what he said was, I'm not going to look at it. If you were stopped during this period of time, we're just going to walk away. And that certainly is not indicative of innocence. Okay. Thank you. Thank you very much. Mr. Bruno. If I may, that's certainly not indicative of guilt either. If counsel has just conceded that Attorney General Farmer just said we're just going to take these 76 cases and we're going to say, well, I'm not going to look any further into it. I'm just going to dismiss them because it's easier for me. I think that supports my point that, in fact, we are entitled to have a fact finder determine just what occurred here in terms of malicious prosecution because the only redress that we have would be in this court. And so if it was a matter of convenience to say, okay, fine, we're going to cut off liability, then I guess Attorney General Farmer did a very good job. But if it's a matter of justice, then I think it was misplaced. Let me just state a couple things with regard to counsel when she said that these are minority troopers. I think the fact of the matter is minority troopers, as I said before, the interim report specifically said that minority troopers were just as prevalent in terms of their activities and targeting minorities once they were stopped as, you know. She said something about the statistics for these two were much different. That's a red herring. The statistics she quotes from are not the statistics after they stopped them and what the conduct that was occurred after the search because that's the statistics that are relevant. And that's where the 80 percent. After a stop occurs, 80 percent of blacks and Hispanics gave a, quote, consensual search, according to the troopers, and 67 percent of those that gave a consensual search were arrested and prosecuted. And they don't have any statistics with regard to these particular troopers on that basis. I think we still have to come up with whether this was a favorable disposition or termination or not. And I'm reminded of a case I read in preparing for this matter where a defendant was convicted and the conviction was reversed and the case was sent back for retrial. And the prosecutor said, we're not going to retry this case. He's already served two and a half years in prison. He's not going to get any more time if we retry this case. I don't want to waste resources retrying it, so I'm going to dismiss the case. The question is whether that was a federal disposition or not. And I believe the decision was that it was not. And if it's not in that case, what would make the disposition in this case favorable? We never got a disposition. We never got a – he was found guilty. And rather than retry, you know, the man who was found guilty, we never got – we never got a – The similarities are administrative disposition in both cases. Administrative disposition where there had been a result. Here there was a result there. We didn't have any result in our case. We have no redress. You know, I can – there's also the case, I think it's the Smith case, which talked about double jeopardy. Obviously there the person was tried a first time, and there is when the standard occurred. And that's where, you know, in the Smith case, us particularly allowed the malicious prosecution claim to go forward. Because I believe that they cited the restatement second of torts, which talks about that. You know, the standard there was restatement of torts 559C. It's abandoned by the prosecutor. So – 659. 659, I'm sorry. So, you know, the Smith case was a double jeopardy case, which it was allowed to proceed. In the other case, you know, there there was a result where it definitely was guilty. Where there you might have the conflicting results, which is what Your Honor had pointed out. In this case you can't have conflicting results because we never had a conviction. And no technicality where all of a sudden he was convicted, but he got off on a technicality, and now he wants to sue for malicious prosecution. You're not going to have that internal conflict that, you know, that would exist. With regard to, you know, the racial profiling where the judge at the motion to suppress stage said, you know, we're finding racial profiling, we had no opportunity to appeal that. That was an interlocutory decision, which we had no opportunity to appeal until after the trial. That would be determined in a post-trial stage. We didn't certainly agree with his – Let's say we were to decide that there was no racial profiling at the stop. Do you lose your case because of that? No, because the conduct after the stop was also racially profiled. All right. How about just prior to the search, or the search itself was not based on racial profiling? Well, the testimony of Moore, as soon as he got up to the side of the car, that's when he decided that he was going to search these people or request the search. He said he came out, you know, he told him to get out of the car. And after the stop, when the stop occurs, when he comes to the side of the car, that's when he definitely sees there are two young African-American males here, out-of-state plates, on the highway, easy pickings. They weren't nuns, so he's not going to just write a – you know, he's not going to write a ticket. If they were two nuns, he would have just written the ticket and they would have been on their way. All right. Does your argument hinge on the fact that their evidence was planted on the basis of racial profiling? Sure. You're not going to plant cocaine on a nun. And so you are saying that two African-American state troopers, racially profiled, two African-American stopped on the turnpike because there was a policy to encourage that type of activity. They were trained to profile from the evidence. Both the testimony officers said they were trained. Their promotions were based upon how much cocaine was determined at different stops. None of these two officers, these sainted angel officers, complained about the training or the profiling until at least two years after the stop. So who's to say what they were doing up until all of a sudden the reports were coming out and they decided to make their own claims of unfair treatment to themselves. Good presentation. You want to finish up? Just briefly, and this is only on the issue of selective prosecution. And that is that we have the discriminatory effect, which I think we showed by the statistics, which show the 80 percent and the 60 percent, shows the effect of what happens when there's a stop on minorities at that time. And we also showed a discrimination of purpose. The judge, the trial, you know, where we have statistics. Well, the trial judge focused, oh, well, there was no word spoken by no racial slurs. Well, actions speak louder than words. And another standard that you can show with regard to a discriminatory purpose is the actions that the officers took in their testimony and the fact that they changed their testimony and that they used boilerplate type of language and the motion to suppress, which was not indicated in the investigation report, such as wires that were dangling down, a broken glove box that would give you reasonable suspicion or probable cause to go further. It was not in their original report. It was a make-wait argument that was used afterwards and also would dovetail into the malicious prosecution, that even though these officers set the motion in the prosecution, they also participated in the prosecution in the motion to suppress stage and at the trial. Thank you, Your Honor. Mr. Brewer, thank you very much. And Ms. Wood, thank you as well. Very ably argued case. Really appreciate it. And we'll take the case under advisement.